

**CROSS LAW FIRM, S.C.**

**CROSS LAW FIRM, S.C.**

**EMPLOYMENT &
BUSINESS LAW**

WWW.CROSSLAWFIRM.COM

Lawyers' Building
845 North 11th St.
Milwaukee, WI 53233
414-224-0000

505 Arcadian Ave
Waukesha, WI 53186
262-548-0001

Satellite Offices:

215 Grand Avenue
Wausau, WI 54403
715-849-5200

111 East Wacker Suite 2600
Chicago, IL 60601

Office-Wide Facsimile:
414-273-7055

Copy

July 1, 2019

*Via Facsimile only*
*(414) 227-4084*

Ms. Monica L. Erdmann
Equal Rights Officer
Department of Workforce Development
Equal Rights Division
819 N. 6th Street, Room 723
Milwaukee, WI 53203-7997

Re:   **Michael Kalkhoff v. Panera Bread**
      **ERD Case No. CR201701253**

Dear Ms. Erdmann:

Complainant Michael Kalkhoff submits this writing in response to the questions posed by Ms. Monica Erdmann and in response to the false assertions made in Respondent Panera Bread's June 10, 2019 Position Statement. Complainant disputes all facts and conclusions of law that contradict his claims as raised by Respondent and he reserves the right to supplement and/or amend his response should additional information become available.

### I.   *Background*

In this harassment and discriminatory treatment case, Mr. Michael Kalkhoff (Complainant), alleges that as a fifty-four (54) year old male, Respondent subjected Complainant to prolonged discriminatory treatment, on the basis of his: (1) sex, (2) age, and (3) his reports of sexual harassment. Mr. Kalkhoff is protected against such behavior under the Wisconsin Fair Employment Law.

Mr. Kalkhoff made multiple reports to his superiors of sexual harassment, and disparaging attacks, perpetuated by Ms. Rebecca Molyneux ("Becky") and Mr. Michael O'Connell, respectively. Respondent's reaction to Mr. Kalkhoff's reports failed to adequately address the harassment suffered by Mr. Kalkhoff within a reasonable time. *Jedrzejewski v. Signicast* (LIRC, 09/16/16). Instead, Respondent conducted an inadequate investigation after Mr. Kalkhoff's first report, ignored Mr. Kalkhoff's second report, and ignored Mr. Kalkhoff's third report. Respondent dismissed Mr. Kalkhoff's reports because he is a middle-aged male and does not fit the stereotypical profile of a sexual harassment victim. Due to Respondent's delayed and ineffective response to Mr. Kalkhoff's reports, Mr. Kalkhoff suffered severe emotional trauma.



As a direct result of Respondent's failure to take appropriate action within a reasonable time, Mr. Kalkhoff endured conditions that rose to the level of constructive discharge. Not only was Respondent's response to Mr. Kalkhoff's reports the result of discrimination against Mr. Kalkhoff based on his sex and age, but Respondent also retaliated against Mr. Kalkhoff for reporting sexual harassment by significantly reducing his hours, such that Mr. Kalkhoff could no longer support himself.

The evidence and timeline in this case support a finding of probable cause.

## II.     *Long Term Sexual Harassment*

Mr. Kalkhoff was employed by Respondent between **October 2016** and **April 2017**. During this short period, Mr. Kalkhoff endured a variety of trials that should never be endured in a place of work, particularly when an abundance of policies exist to prevent such experiences—policies which Respondent helpfully provide. *Respondent's Answer*, Exhibit A. Unfortunately, the Respondent's abundant policies are useless unless they are put into practice. Respondent failed to follow their policies in the instant case, which resulted in Mr. Kalkhoff's discriminatory treatment, as well as his severe emotional injury.

Respondent conveniently disregard that Ms. Molyneux had a history of engaging in inappropriate behavior at work, which they repeatedly failed to adequately address. For instance, Ms. Molyneux continually brought a male figure to work with her and placed the doll throughout Respondent's Brookfield store. Ms. Molyneux would manipulate the doll and place it in sexually suggestive positions. *See* Exhibit 8. Ms. Molyneux referred to the doll as her "man stripper." On information and belief this doll only appeared at the store after Mr. Kalkhoff began working there. Ms. Molyneux's behavior made Mr. Kalkhoff extremely uncomfortable, and he reported the behavior to Respondent manager Julie Goodwater—including that the doll was placed in sexual positions—on **December 8, 2016**. Ms. Goodwater's only response was "I'll talk to her." The doll continued to appear around the store throughout Mr. Kalkhoff's employment. This "man stripper doll" is an example of Ms. Molyneux's inappropriate workplace behavior, and Respondent's inadequate responses to complaints about the same.

Ms. Goodwater failed to appropriately address Ms. Molyneux's offensive conduct, and as a result, Ms. Molyneux's behavior escalated. Ms. Molyneux chose Mr. Kalkhoff as her victim. Ms. Molyneux made unwelcome physical contact of a sexual nature with Mr. Kalkhoff on multiple occasions, which he reported to Respondent manager Julie Goodwater on **December 1, 2016, December 15, 2016**; to Respondent manager Justin Sohl on **February 14, 2017**; and finally, to Respondent manager Sohl via text message on **April 6, 2017**. Only after Mr. Sohl received Mr. Kalkhoff's written text message on April 6, 2017, did Respondent make any substantial effort to address the harassment Mr. Kalkhoff had endured, but at that point it was too late.

A single example of Ms. Molyneux's habitual behavior occurred on **November 23, 2016**. Mr. Kalkhoff recorded that Ms. Molyneux wiped the bench where they were

both working in a sweeping side to side motion. Ms. Molyneux purposefully, repeatedly touched Mr. Kalkhoff's genitals while performing the sweeping motion. Immediately after touching Mr. Kalkhoff, Ms. Molyneux whispered to Respondent employee Ryan Werner, "I got him again." There was no doubt that Ms. Molyneux's actions were both unwelcome and sexual in nature.

Ms. Molyneux continued to sexually harass Mr. Kalkhoff via similar instances of unwelcome contact of a sexual nature. Ms. Molyneux would make an effort to touch Mr. Kalkhoff's buttocks or genital area *multiple times every shift*. No matter how much Mr. Kalkhoff tried to avoid Ms. Molyneux, she sought him out.

On **December 1, 2016**, Mr. Kalkhoff approached Respondent manager Julie Goodwater and explained to her that Ms. Molyneux had repeatedly touched him in a sexual manner and that on *at least six (6) occasions* he asked Ms. Molyneux to stop. Mr. Kalkhoff explicitly stated that Ms. Molyneux engaged in this behavior *forty (40) to fifty (50) times a shift*. Instead of immediately looking into Ms. Molyneux's behavior, Ms. Goodwater simply told Mr. Kalkhoff that she would have to speak to her own manager, Justin Sohl about how to handle the situation. In light of the severity of the reported harassment, Respondent's handling of the situation was neither adequate nor effective. Sexual harassment should not be tolerated, regardless of the victim's sex. Due to Ms. Goodwater's response, Ms. Molyneux apparently felt free to continue her injurious conduct.

Respondent asserts they "should not be held liable for any harassment when it has exercised reasonable care to prevent and correct promptly any harassment." *Respondent's Answer*, at 9. However, Respondent failed to take appropriate action within a reasonable time, which is the relevant standard here. *Jedrzejewski v. Signicast* (LIRC, 09/16/16). Respondent would like you to consider a single interview of Ms. Molyneux and informing managerial staff to "monitor the associates working on the line" to qualify as appropriate action and reasonable care. *Respondent's Answer*, at 4. In light of Ms. Molyneux's previous inappropriate sexual behavior at work and Mr. Kalkhoff's allegations that he was harassed forty (40) to fifty (50) times a shift, Respondent's response hardly seems appropriate. Even if the ERD finds that a single interview and dismissal of Mr. Kalkhoff's complaint was appropriate, in spite of Ms. Molyneux's history of making others uncomfortable with a sexually explicit figurine, Respondent's response can hardly be considered appropriate after Mr. Kalkhoff reported that <u>the behavior continued</u>.

On **December 14, 2016**, Ms. Molyneux once again initiated nonconsensual physical contact of a sexual nature. Mr. Kalkhoff recorded that Ms. Molyneux used her right hand to touch his left butt cheek. Mr. Kalkhoff suffered severe emotional anxiety as a result of this behavior, and dreaded every day that he came to work, knowing that he would be violated by Ms. Molyneux. It had been *two (2) weeks* since Mr. Kalkhoff reported his harasser's behavior to Ms. Goodwater, and nothing had changed.

On **December 15, 2016**, Mr. Kalkhoff made another attempt to stop Ms. Molyneux's harassment. Yet again, Mr. Kalkhoff spoke to Ms. Goodwater and specified that Ms. Molyneux's behavior continued and gave the example of Ms. Molyneux's behavior



from December 14th. Once again, Ms. Goodwater's response was nothing short of disappointing. Ms. Goodwater told Mr. Kalkhoff, *"well, you know, we work in close quarters."* Mr. Kalkhoff was fully aware that the staff worked in close quarters, but he was also aware that Ms. Molyneux was the only employee that repeatedly touched him in a sexual manner without his consent. Only the day before, Ms. Molyneux chastised a coworker stating "don't brush up against me, that's rude." Clearly Ms. Molyneux knew that her intentional, unwelcome sexual contact with Mr. Kalkhoff was far more than rude. Mr. Kalkhoff made sure to point out to Respondent that "she [Ms. Molyneux] is the only one who does this out of 12 people." Ms. Goodwater repeatedly gave Ms. Molyneux the benefit of the doubt because she was a female, while Mr. Kalkhoff was left to endure further harassment, because Respondent refused to believe a female would sexually harass a fifty-four (54) year old male. Yet again, Ms. Goodwater simply stated that she would have to talk to her boss.

Respondent states that "[at] no time during his employment [did Mr. Kalkhoff] ever complain to Ms. Goodwater that his supervisor inappropriately touched him countless times per day or that he felt treated differently." *Respondent's Answer, at 10.* While multiple reports of sexual harassment should be enough to elicit an effective response, Mr. Kalkhoff's account of his **December 1, 2016** conversation with Ms. Goodwater contradicts Respondent's statement. Mr. Kalkhoff recorded in his journal entry for that very day that during his conversation with Ms. Goodwater he told her that Ms. Molyneux had touched him inappropriately *forty (40) to fifty (50) times a shift. See* Exhibit 4.

Respondent's response to Mr. Kalkhoff's first report was clearly inadequate. Ms. Goodwater did not ask Mr. Kalkhoff any further questions. Ms. Goodwater interviewed Ms. Molyneux and her assistant manager, and determined that no inappropriate behavior had occurred. *Respondent's Answer, at 4.* At this time, Ms. Goodwater simply informed the management team to be on the lookout for inappropriate touching. *Respondent's Answer, at 4.* Ms. Goodwater still did not ask Mr. Kalkhoff any further questions to determine the weight and credibility of the allegations. Ms. Goodwater simply accepted Ms. Molyneux's word over Mr. Kalkhoff's because Mr. Kalkhoff did not fit the profile of the typical victim of sexual harassment, and Ms. Molyneux did not fit the typical profile of a harasser. Ms. Goodwater failed to perform an investigation proportionate to the severity of Mr. Kalkhoff's claims due to Mr. Kalkhoff's sex and age.

Respondent's response to Mr. Kalkhoff's second report was equally discriminatory. If Mr. Kalkhoff had been a younger, female employee, Respondent managers like Ms. Goodwater would have taken Mr. Kalkhoff's claims seriously. Instead, because Mr. Kalkhoff was a fifty-four (54) year old male and did not fit the typical profile of a sexual harassment victim, Ms. Goodwater simply brushed off his claims, refusing to believe reports that were clearly true.

Mr. Kalkhoff informed his employer of the harassment he was suffering and his employer failed to take appropriate action within a reasonable time. *Monroe v. Birds Eye Foods, Inc.* (LIRC 03/31/2010). Mr. Kalkhoff made multiple reports, only one of which elicited **any** response. Respondent's failure to even record Mr. Kalkhoff's

Ms. Monica L. Erdmann
July 1, 2019
Page 5



second report on **December 15, 2016** is evidence in and of itself that they failed to take appropriate action within a reasonable time. Even after *two (2) separate reports*, the second of which confirmed that Ms. Molyneux's behavior was ongoing, Respondent failed to take appropriate action. Ms. Goodwater failed to even follow up with Mr. Kalkhoff to ensure that he had no further instances to report. Ms. Goodwater did not separate Ms. Molyneux and Mr. Kalkhoff. Respondent's efforts to respond to Mr. Kalkhoff's cries for help were minimal at best, and far from appropriate.

By **February 2017**, Mr. Kalkhoff had endured months of consistent and severe sexual harassment. The sexual harassment took a physical and emotional toll on Mr. Kalkhoff, and his ignored pleas for assistance only further entrenched his emotional suffering. Mr. Kalkhoff felt defeated. On **February 13, 2017** and **February 14, 2017**, Mr. Kalkhoff attempted to obtain Respondent supervisor Justin Sohl's phone number from two (2) different Respondent employees. Each time Mr. Kalkhoff had reported Ms. Molyneux's behavior, Ms. Goodwater said she would have to speak to Mr. Sohl—Mr. Kalkhoff thought that perhaps if he went straight to the source, something might finally change. Finally, on the evening of **February 14, 2017**, Mr. Kalkhoff reached Justin Sohl and told him about Ms. Molyneux's behavior. Mr. Sohl had been aware of the allegations all along; Mr. Sohl was just as complicit in Respondent's failure to adequately address Mr. Kalkhoff's allegations.

On December 1, 2016, Mr. Kalkhoff reported that Ms. Molyneux had touched him on the buttocks or his genital area forty (40) to fifty (50) times a shift. On December 15, 2016, Mr. Kalkhoff reported that Ms. Molyneux's behavior continued. Finally, on February 14, 2017 Mr. Kalkhoff reported the sexual harassment to Respondent supervisor Justin Sohl. Mr. Kalkhoff provided Respondent with three (3) opportunities to take appropriate action. A single interview of the perpetrator of serial sexual harassment does not appropriate action make. Three (3) times Respondent failed to take appropriate action. Respondent attempt to fixate on Mr. Kalkhoff's reluctance to participate in an investigation following his **April 6, 2017** text message. *Respondent's Answer*, at 6. The truth is that after months of unaddressed sexual harassment, Respondent had made it impossible for Mr. Kalkhoff to return to his position at the Brookfield Panera. Respondent's discriminatory response convinced Mr. Kalkhoff that he would never be believed.

### III. *Further Discriminatory Treatment*

On or about **February 10, 2017**, Mr. Kalkhoff reported to Ms. Goodwater that he was having trouble working with another Respondent employee: Mr. O'Connell. Respondent attempt to minimize Mr. O'Connell's behavior and paint Mr. Kalkhoff as a petty complainant by stating that "Mr. O'Connell was getting a little short fused with [Mr. Kalkhoff] in the mornings, and he would lose his patience with him." *Respondent's Answer*, at 5. To be clear, Mike O'Connell repeatedly engaged in threatening and unprofessional behavior. Mr. O'Connell would frequently yell and throw things. Mr. O'Connell's violent behavior was often directed at Mr. Kalkhoff. For example, Mr. O'Connell would throw order boxes and metal binder clips, which Mr. Kalkhoff would be forced to pick up. When Mr. Kalkhoff reported Mr. O'Connell's behavior, Ms. Goodwater commented that she had received complaints



about Mr. O'Connell from other employees as well. Respondent consistently ignored personnel issues at the Brookfield store. Mr. Kalkhoff did not witness Mr. O'Connell treat female employees in this "short fused" manner.

Respondent grew sick and tired of Mr. Kalkhoff's self-advocacy. Respondent was tired of Mr. Kalkhoff's reports of harassment and other personnel issues that they preferred to ignore. All Mr. Kalkhoff wanted was a work environment that was free from harassment; where everyone was treated as equals and everyone acted professionally

While Respondent did nothing more than interview Ms. Molyneux following Mr. Kalkhoff's reports of sexual harassment, they were more than happy to offer Mr. Kalkhoff an alternative position so he could avoid Mr. O'Connell's tyrannical behavior. Little did Mr. Kalkhoff know that this offer reduced his hours to the point where he could not even cover his living expenses. Mr. Kalkhoff was being pushed out in retaliation for his reports of harassment.

Respondent states that "[n]o associate is guaranteed a set schedule or position each week," however, it is far from coincidental that Mr. Kalkhoff was only subjected to a substantial reduction in hours **after** engaging in a protected activity. *Respondent's Response*, at 9. Before reporting sexual harassment, Mr. Kalkhoff worked a similar number of hours and a discrete number of positions without issue. While it may be true that no associate is *guaranteed* a set schedule or position each week, Respondent could hardly claim that an employee's schedule is variable by approximately seventeen (17) hours a week. Respondent's reduction of Mr. Kalkhoff's hours by approximately three and a half (3.5) hours a day can hardly be labeled a mere variance in scheduling. Respondent is aware that most of its employees work at Panera in an effort to support themselves, not simply as a hobby. Respondent's reduction of Mr. Kalkhoff's hours by approximately seventeen (17) hours a week was a targeted retaliatory measure intended to push Mr. Kalkhoff out of his job. If Respondent simply reduced Mr. Kalkhoff's hours to the point where he could not support himself, he would have to leave Panera, and they would be rid of Mr. Kalkhoff and his reports of harassment.

Respondent's offer of a position change was simply a pretext for reducing Mr. Kalkhoff's hours. Of course when "Ms. Goodwater told [Mr. Kalkhoff] that…she could find something that was a good fit for him," Mr. Kalkhoff was interested in the opportunity. Mr. Kalkhoff did not want to quit, he liked his job with Respondent, but he could not continue to work in an environment where he was subject to sexual harassment and violent behavior. Mr. Kalkhoff simply could not handle such an environment for much longer. As much as Respondent exaggerates that Ms. Goodwater "wanted to give [Mr. Kalkhoff] added responsibility," responsibility is not what pays the bills. *Respondent's Answer*, at 5. Added responsibility does nothing to contradict that Respondent significantly reduced Mr. Kalkhoff's hours, in retaliation for his reports of sexual harassment.

It is also incredibly suspicious that Respondent failed to disclose that accepting Respondent's offer would require a severe reduction in Mr. Kalkhoff's scheduled



hours. Essential information regarding a job includes not only the duties involved, but also the rate of pay and the number of hours an employee is expected to work. Respondent purposefully concealed the reduction in hours so that Mr. Kalkhoff would accept the position. While Respondent would like you to believe that they exchanged Mr. Kalkhoff's hours for "added responsibility," this is simply a ruse to cover up Respondent's retaliatory demotion.

The timeline of Mr. Kalkhoff's reports and his demotion add even greater support to the causal connection between Mr. Kalkhoff's reports. Mr. Kalkhoff made his first report of sexual harassment on December 1, 2016. Mr. Kalkhoff made his second report of sexual harassment on December 15, 2016. Mr. Kalkhoff reported Mr. O'Connell's harassment on February 10, 2017. Mr. Kalkhoff was not only demoted on or about February 10, 2017, but Mr. O'Connell also surpassed Mr. Kalkhoff and was placed in a positon that Mr. Kalkhoff had trained for.

### IV. Constructive Discharge

While constructive discharge is not found in *every* sexual harassment case, it is found where the conduct at issue "made working conditions so intolerable that a reasonable person would feel compelled to resign." *Harper v. Menard, Inc.*, (LIRC, 09/18/09). "A smattering of sexually-tinged comments made over the course of a year and a half, while certainly unpleasant and distasteful, is not sufficient to create a hostile working environment or to render working conditions so intolerable that a reasonable person would feel compelled to resign." *Id.*

The harassment endured by Mr. Kalkhoff was far more intrusive and destructive than a mere "smattering of sexually-tinged comments over the course of a year and a half." Mr. Kalkhoff was forced to work in close quarters with a coworker that not only made sexually-tinged comments, such as "I got him again," but also purposefully and repeatedly made unwanted physical contact with Mr. Kalkhoff's genitalia. After Ms. Goodwater discredited Mr. Kalkhoff's December 1, 2016 complaint, and failed to appropriately respond, Ms. Molyneux was only emboldened. Ms. Molyneux continued to violate Mr. Kalkhoff's person, touching him inappropriately. We are not talking about a casual brush resulting from close quarters. Mr. Kalkhoff's buttocks and genitalia were touched multiple times a shift. Such conduct is not "unpleasant and distasteful," it is intolerable and unacceptable. Ms. Molyneux's behavior, and Respondent's failure to appropriately respond, caused Mr. Kalkhoff severe emotional distress. Mr. Kalkhoff experienced extreme fear and anxiety every time he had to go to work, afraid of Ms. Molyneux's perpetual physical attacks. It is impossible to fittingly articulate the extent of the damage Respondent caused by allowing Ms. Molyneux's attacks to continue. The sexual harassment Mr. Kalkhoff experienced created working conditions that were so intolerable that any reasonable person would fear returning to work.

The emotional toll of Ms. Molyneux's behavior came to a head on April 6, 2017. Mr. Kalkhoff sent a text to Mr. Justin Sohl informing him that he had been sexually abused and that he was "afraid to go back." *Respondent's Answer, at 6*. Perhaps Mr. Kalkhoff's cry for help finally received a significant response because it was in



writing, or perhaps four (4) reports is what it takes to capture Respondent's attention. Nevertheless, constructive discharge had already occurred. Ms. Molyneux's conduct and Respondent's failure to appropriately respond within a reasonable time had created conditions so intolerable, that Mr. Kalkhoff was too fearful of Ms. Molyneux to return. Respondent created conditions rising to the level of a constructive discharge.

### V. Witness Information

**Joan Sternig**, was the "night manager" during Mr. Kalkhoff's employment with Respondent. Ms. Sternig would likely provide information substantiating Mr. Kalkhoff's claims of sexual harassment and discrimination.
*Address:* 1612 Blackhawk Trail
Waukesha, WI 53186

**Ryan Werner**, was Mr. Kalkhoff's coworker and witnessed some of Ms. Molyneux's attacks as well as Mr. O'Connell's violent behavior. As a result, Mr. Werner could likely substantiate Mr. Kalkhoff's claims against those respective Respondent employees.
*Address*: 4350 S Delphine Dr.
New Berlin, WI 53151

### VI. Conclusion

For the above described reasons, Complainant respectfully requests a finding of Probable Cause so that this matter can proceed to discovery and ultimately to a hearing before an Administrative Law Judge who can make the appropriate credibility determinations.

Very truly yours,
**CROSS LAW FIRM, S.C.**

William Wetzel
Attorney at Law
wetzel@crosslawfirm.com
WW/rng

cc: Mr. Michael Kalkhoff (Via Email Only)